15-3764
Soto v. Gaudett

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued: October 19, 2016                                    Decided: July 5, 2017)

Docket No. 15-3764

_____

ORLANDO SOTO, Conservator of the Estate of Israel Soto,

*Plaintiff-Appellee*,

- v. -

Chief of Police JOSEPH GAUDETT, individually and in his official capacity; Officer
MARTIN HEANUE, individually and in his official capacity; Officer DAMIEN CSECH,
individually and in his official capacity; Officer CHRIS ROBINSON, individually and in
his official capacity; Sergeant CHRISTOPHER STEPNIEWSKI, individually and in his
official capacity; CITY OF BRIDGEPORT,

*Defendants-Appellants*,

Officer JANE DOE, individually and in her official capacity; Officer JOHN DOE,
individually and in his official capacity,

*Defendants*.[*]
_____

Before:  KEARSE, JACOBS, and POOLER, *Circuit Judges*.

---

[*]     The Clerk of Court is directed to amend the official caption to conform with the
        above.

Appeal by defendants police officers, chief of police, and the City of Bridgeport ("City") from so much of an order of the United States District Court for the District of Connecticut, Warren W. Eginton, *Judge*, as denied their motions for fsummary judgment dismissing on grounds of qualified immunity, claims brought under 42 U.S.C. § 1983 by plaintiff as conservator of the estate of his brother Israel Soto ("Soto") for use of excessive force by the officers in connection with Soto's flight from police. The district court ruled principally that there were genuine issues of material fact precluding the grant of the motions of three officers who deployed tasers against Soto, including one officer whose police cruiser was involved in a collision with Soto. On appeal, those officers argue that their motions should have been granted because their taser deployments were objectively reasonable and because the collision of the police cruiser with Soto was accidental; the City and the police chief argue that they are entitled to qualified immunity on the ground that Soto's constitutional rights were not violated. We conclude that the court erred in denying summary judgment to one officer for his taser deployment; we dismiss the appeals of the other defendants for lack of appellate jurisdiction. *See Soto v. Gaudette*, 2015 WL 6453083 (D. Conn. Oct. 23, 2015).

Reversed in part and dismissed in part.

MICHAEL P. FOLEY, Jr., Cheshire, Connecticut (David K. Jaffe, Brown Paindiris & Scott, Hartford, Connecticut, on the brief), *for Plaintiff-Appellee*.

JOHN JERRY GLAS, New Orleans, Louisiana (Deutsch Kerrigan, New Orleans, Louisiana; Richard G. Kascak, Jr., Associate City Attorney for the City of Bridgeport, Bridgeport, Connecticut, on the brief), *for Defendants-Appellants*.

KEARSE, *Circuit Judge*:

Defendants Joseph Gaudett, Martin Heanue, Damien Csech, Chris Robinson, Christopher Stepniewski, and City of Bridgeport (the "City" or "Bridgeport") (collectively "Defendants") appeal from so much of an order of the United States District Court for the District of Connecticut, Warren W. Eginton, *Judge*, as denied their motions for summary judgment dismissing, on the basis of qualified immunity, claims brought under 42 U.S.C. § 1983 by plaintiff as conservator of the estate of his brother Israel Soto ("Soto") for use of excessive force in the deployment of tasers and in striking Soto with a police cruiser, in connection with Soto's flight from police. Csech, Stepniewski, and Robinson contended that their taser deployments were objectively reasonable; Robinson contended that his vehicle's striking Soto was accidental; and Gaudett and the City sought summary judgment on the ground that Soto's constitutional rights were not violated. Defendants pursue these arguments on appeal. The district court denied these motions on the ground that there are genuine issues of material fact to be tried. For the reasons that follow, we conclude that the court erred in denying summary judgment to Csech and that its other denials of summary judgment are not immediately appealable.

## I. BACKGROUND

The present litigation arises out of events in Bridgeport, Connecticut, beginning shortly after 2 a.m. on January 23, 2008, that commenced as a car-chase, became a foot-chase, and culminated in the capture and arrest of Soto. Heanue, Csech, and Robinson, Bridgeport police officers, and

Stepniewski, a police sergeant (collectively the "Officers"), were involved in the pursuit and/or capture of Soto. Gaudett, not alleged to have been personally involved, was Bridgeport's chief of police.

The injuries suffered by Soto in the course of those events included a fractured skull and severe traumatic brain damage. The complaint alleges that he lost the ability to speak, walk, or otherwise act as a functional human being, and requires around-the-clock care and life support. The factual evidentiary record in the district court thus consists principally of police records, including reports filed by the Officers, deposition testimony of the Officers, and transcripts of interviews of the Officers by the Bridgeport Police Department's Office of Internal Affairs ("OIA"). The record also includes OIA's interview of Carl Young, one of the other occupants of the pursued vehicle. The general sequence of events is not seriously disputed; the following description, except as indicated, reflects that sequence in the light most favorable to the plaintiff. Various details as to the Officers' reports and sworn statements are added in Part II.C.

A. *The Events*

At approximately 2:18 a.m. on January 23, 2008, Heanue, driving a marked police car, observed a vehicle--eventually identified as a Toyota Camry (the "Camry")--traveling without headlights, and making a turn without signaling. When Heanue began to follow the Camry and activated his car's siren and flashing lights in an attempt to stop the Camry, the Camry, occupied by three men, accelerated and sped through several red lights. Heanue radioed on a police channel that he was in pursuit, and soon several other police vehicles, with strobe lights and sirens activated, were involved.

4

With Heanue following, the Camry made several turns; sped the wrong way on a one-way street--Fairfield Avenue--nearly colliding with at least one police car coming toward it; and eventually turned south onto Park Avenue, following it to Waldemere Avenue ("Waldemere"), which bordered the north end of Seaside Park ("Seaside"). The Camry went over the curb, onto the grass inside the park, and before it came to a stop the occupants jumped out. Heanue saw the driver fall and be run over by the Camry's left rear tire, and saw one passenger--later identified as Carl Young--exit a rear door and run deeper into the park. The driver of the Camry, after the car rolled over him, got up immediately. Heanue drove into the park to follow Young, whom he captured.

In the meantime, Soto--who according to Young was the other passenger in the Camry, not the driver--had exited the car and had run in the opposite direction from that taken by Young. Csech (driving one of the police cars nearly hit by the Camry on Fairfield Avenue) had proceeded down Park Avenue and turned onto Waldemere, where he parked and exited. Csech saw Soto running through the park and yelled at him to stop. Soto continued to run toward the intersection of Park Avenue and Waldemere. Robinson was then slowly driving south on Park Avenue in the northbound lane, scanning the area for suspects. As Soto was running across Park Avenue, Robinson's cruiser struck Soto.

Soto was thrown backwards from the collision and hit his head on the ground, but he immediately got up and resumed running. Csech again yelled to Soto to stop; when he did not, Csech, then some 25 feet away, shot Soto with a taser. Soto fell on the pavement, flat on his face, unable to brace himself.

Stepniewski did not see Soto's collision with Robinson's cruiser. He had preceded Csech and Robinson down Park Avenue and had turned east on Waldemere; Stepniewski was about

5

1,000 feet east of Park Avenue when he saw Soto running through the park toward Waldemere. When Soto had resumed running after his collision with Robinson's cruiser, Stepniewski and Robinson followed Csech in the foot-chase of Soto; they saw Csech tase Soto, and saw Soto fall. Csech, Stepniewski, and Robinson continued to run toward the fallen Soto. When Soto, entangled in the wires of Csech's taser, appeared to be trying to rise from his prone position, both Robinson and Stepniewski, at or about the same time, shot Soto with their tasers, from a distance of two-to-five feet.

After these subsequent taser shots, Soto fell to the ground, did not move again, and was unresponsive. A medical team was summoned and took him to the hospital with serious injuries.

In the meantime, the Officers did not catch the third occupant of the Camry, and the vehicle itself had disappeared. It was quickly recovered in a nearby neighborhood, however. It was determined that the Camry had been stolen some weeks earlier, and that its contents on January 23 included numerous items of stolen property. Soto was charged with multiple traffic violations and with several crimes, including attempted assault of a police officer. Given his continued physical condition, he has never been convicted, tried, or arraigned on those charges.

B. *The Present Action and Defendants' Summary Judgment Motions*

In 2010, plaintiff Orlando Soto commenced the present action on behalf of Soto principally under 42 U.S.C. § 1983. The complaint alleged that the Officers violated Soto's Fourth Amendment rights by arresting him without probable cause--apparently on the premise that Soto was not the driver of the Camry (the false arrest claim (count 3))--and by using excessive force in connection with his arrest, to wit, the use of tasers by Csech, Stepniewski, and Robinson, and the collision of Robinson's cruiser with Soto (count 1); it alleged that Gaudett and the City were liable for

those violations by reason of maintaining policies, practices, and customs amounting to deliberate indifference to constitutional rights (count 2). The complaint also alleged several state-law claims.

Following discovery, Defendants moved in 2015 for summary judgment dismissing the complaint in its entirety. With respect to the § 1983 claims, Defendants principally contended that they were entitled to qualified immunity. Csech, Robinson, and Stepniewski argued that it was not "clearly established" that taser deployments against "fleeing suspects" were unconstitutional (Memorandum in Support of Defendants' Motion for Summary Judgment and Motion for Qualified Immunity ("Defendants' SJ/QI Mem.") at 9) and, alternatively, that their deployments were "objectively reasonable" (*id*. at 19). Robinson also stated that the collision of his cruiser with Soto had been unintentional and argued that he was thus entitled to qualified immunity on the ground that "accidentally striking a fleeing suspect with a police vehicle does not constitute a Fourth Amendment seizure" (*id*. at 27). Gaudett and the City claimed that they were entitled to qualified immunity (*see id*. at 36) on the ground that plaintiff had "failed to prove that the (alleged) constitutional violations by the City of Bridgeport Officers were based on a municipal policy, custom or practice" or a "deliberate choice" on the part of policymakers (*id*. at 37-38) and "failed to prove that the (alleged) failure to train was the cause of Mr. Soto's injuries" (*id*. at 38).

C. *The Decision of the District Court*

The district court granted Defendants' motions to dismiss the claim against Heanue for use of excessive force and the claims against all of the Officers for false arrest. It denied the motions to dismiss (a) the claims that excessive force was used by Csech, Stepniewski, and Robinson in the deployment of their tasers, (b) the excessive force claim based on the collision of Robinson's cruiser

7

with Soto, and (c) the claims against Gaudett and the City. *See Soto v. Gaudette* [*sic*], No. 3:10-cv-106, 2015 WL 6453083 (D. Conn. Oct. 23, 2015).

The court discussed the general principles that on a motion for summary judgment, the moving party has the burden of demonstrating the absence of any genuine issue to be tried as to any material fact; that in ruling on such a motion, the court is required to resolve all ambiguities and draw all reasonable inferences against the moving party, viewing the record in the light most favorable to the party against whom summary judgment is sought; and that the court cannot properly resolve a disputed issue of fact by making credibility determinations. *See* 2015 WL 6453083 at *3-*6. The court noted that, in the present case,

> [d]ue to plaintiff's asserted inability to communicate, the Court has only the defendants' testimony and police reports and records to assess the circumstances of the alleged violations. "[T]he court may not simply accept what may be a self-serving account by the police . . . but must also consider circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *O'Bert ex rel[.] Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003).

2015 WL 6453083, at *3; *see also id*. at *5 (it would be "error if [the court] accepted the officers' version of events without considering any potential factual inferences arising from the described circumstances construed most liberally for plaintiff").

Turning to the taser claims, the district court stated as follows:

> This Court has found no Second Circuit or Supreme Court precedent establishing that a *fleeing suspect* had a right not to be subjected to non-lethal force of a taser as of January 23, 2008. See *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 494-97 (6th Cir. 2012) (as of July 3, 2008, *fleeing* misdemeanant did not have "clearly established right" to be free of taser *while fleeing*). As of January 23, 2008, Fourth Amendment jurisprudence had "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat

8

thereof to effect it" and that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Graham*[ *v. Connor*], 490 U.S. [386,] 396 [(1989)].

At the same time, according to Second Circuit precedent, it was also clearly established law as of January 23, 2008, that use of significant non-lethal force--such as a taser or pepper spray--against a *compliant or non-threatening* suspect *would* violate the Fourth Amendment. *Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010) (considering incident occurring in April 2000) . . . .

2015 WL 6453083, at *5 (emphases added). The court concluded that there must therefore be "a factual determination whether each officer's taser deployment represented a response to a non-compliant individual's efforts to resist arrest or a gratuitous use of force against an incapacitated individual who posed no immediate threat" of force or flight. *Id*.

"[M]indful that the officers' testimony and police reports comprise the evidentiary basis" for such a determination, *id*., thus making the resolution of the factual issue depend on assessments of credibility, the court concluded that "[a] jury will be required to determine whether to accept as credible Officer Csech's depiction of the events leading to his taser deployment," *id*. at *6. The court reached the same conclusion with respect to the taser deployments by Robinson and Stepniewski, stating that

the Court cannot rely without question upon defendant Robinson's and Stepniewski's reports that they deployed their tasers without knowledge of each other's actions when they both observed plaintiff pushing up off the ground. *Questions of fact remain relative to whether plaintiff presented a threat or resistence* [*sic*] *when he was lying face down on the ground after having been hit by a car and tased in the back*; and whether either Robinson or Stepniewski perceived one another's conduct prior to resolving to deploy a taser.

*Id*. (emphasis added).

9

With respect to the claim that the collision between Robinson's cruiser and Soto constituted the use of excessive force, the district court similarly concluded that the matter of whether that collision was accidental or intentional depended on assessment of Robinson's credibility:

> [Robinson] asserts that he did not commit a constitutional violation of plaintiff's rights because he did not intentionally strike plaintiff. He also contends that he is entitled to qualified immunity. *Consistent with its previous discussion, the Court cannot determine credibility or intent on summary judgment. The motion for summary judgment will be denied on this basis.*

*Id.* (emphasis added).

Finally, in denying the summary judgment motions of Gaudett and the City, the court stated as follows:

> Defendants maintain that Bridgeport's policies concerning the use of force and tasers were consistent with other police departments' comparable policies at the time. Defendants assert further that plaintiff has not raised an inference that Bridgeport, through its policy maker, made a "deliberate choice" not [to] train its police officers or that there was any deficient training that was likely to result in a violation of constitutional rights. Plaintiff has submitted evidence, including an expert report, that raises an inference of *officer noncompliance* with Bridgeport police procedures, *deficient police investigations*, *failure to provide additional training or counseling despite notice of deficiencies*, and *inadequate internal investigations*. The Court will leave plaintiff to his proof that such policies or practices resulted in a police department that was deliberately indifferent to excessive force violations.

2015 WL 6453083, at *8 (emphases added).

## II. DISCUSSION

On appeal, Defendants contend principally (a) that Csech, Stepniewski, and Robinson should have been granted summary judgment on the basis of qualified immunity because taser

deployments against a fleeing or threatening suspect did not violate any clearly established constitutional right; (b) that Robinson was entitled to such a judgment with respect to his cruiser's collision with Soto because that collision was accidental; and (c) that Gaudett and the City were entitled to qualified immunity on the ground that none of Soto's constitutional rights were violated. Although Heanue also was designated as an appellant in this appeal, the district court had dismissed all of the § 1983 claims against him, and no arguments are presented on his behalf.

For the reasons that follow, we conclude that, given the pertinent allegations in the complaint, the district court erred in failing to apply the fleeing-suspect principle to Csech and should have granted his qualified-immunity-based motion for summary judgment. With regard to Stepniewski and Robinson, we lack jurisdiction to entertain their appeals, because the district court denied their motions on the ground that there were genuine issues of material fact to be resolved before their entitlement to qualified immunity could be known, and because the record, when viewed in the light most favorable to the plaintiff, does not entitle them to qualified immunity as a matter of law. The appeals by the City and Gaudett in his official capacity--entities to which principles of qualified immunity are inapposite--are also dismissed for lack of appellate jurisdiction.

A. *Qualified Immunity, Summary Judgment, and Appealability*

"The doctrine of '[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) ("*Rogoz*") (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) ("*Tracy*"); *Papineau v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). When

11

a defendant official seeks summary judgment on the ground that he is entitled to qualified immunity, the motion should be granted if either the evidence, viewed in the light most favorable to the plaintiff, is insufficient to establish the violation of a statutory or constitutional right, or if that right was not clearly established at the time of the alleged violation. *See*, *e.g.*, *Tracy*, 623 F.3d at 96; *Rogoz*, 796 F.3d at 247.

A motion for summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "there can be but one reasonable conclusion as to the verdict," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ("*Liberty Lobby*"), *i.e.*, "it is quite clear what the truth is," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962) (internal quotation marks omitted), and no rational factfinder could find in favor of the nonmovant. In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255; *see*, *e.g.*, *Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"). Summary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party. *See*, *e.g.*, *Liberty Lobby*, 477 U.S. at 248.

In cases in which officers have used deadly force, leaving "the witness most likely to contradict" the officers' version of the events "unable to testify[,] . . . . the court may not simply accept

12

what may be a self-serving account by the police officer" but must instead "consider circumstantial evidence that, if believed, would tend to discredit the police officer's" version and must "undertake a fairly critical assessment of, *inter alia*, the officer's original reports or statements . . . to decide whether the officer's testimony could reasonably be rejected at a trial." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ("*O'Bert*") (internal quotation marks omitted). As the district court here noted, the record should be given the same careful scrutiny where the alleged victim of excessive force is alive, but the events have left him incapable of communicating.

Ordinarily, the denial of summary judgment is not immediately appealable because such a decision is not a "final" judgment, 28 U.S.C. § 1291. *See generally Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). However, where a summary judgment motion is based on a substantial claim of qualified immunity, the district court's denial of the motion is immediately appealable under the *Cohen* doctrine to the extent that the denial turned on an issue of law, *see, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), although not to the extent that the merits of the defense depend on the resolution of questions of fact, *see, e.g.*, *id.*; *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Johnson v. Jones*, 515 U.S. 304, 313-18 (1995); *O'Bert*, 331 F.3d at 38; *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) ("*Salim*")); *In re State Police Litigation*, 88 F.3d 111, 124 (2d Cir. 1996). The "portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial . . . . is not appealable." *Johnson*, 515 U.S. at 313.

Thus, "after the denial of the defendants' motions for summary judgment, 'we have jurisdiction to review a denial of qualified immunity to the extent it can be resolved on stipulated facts, *or on the facts that the plaintiff alleges are true*, or on the facts favorable to the plaintiff that the

13

trial judge concluded the jury might find.'" *Terebesi v. Torreso*, 764 F.3d 217, 222 (2d Cir. 2014) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (emphasis ours)), *cert. denied* 135 S. Ct. 1842 (2015). "What we may not do, after *Johnson* and *Behrens*, is entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense." *Salim*, 93 F.3d at 91.

B. *Claims of Excessive Force*

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use *some degree* of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis added). However, it is also well established that law enforcement officers violate the Fourth Amendment if the amount of force they used was not "'objectively reasonable' in light of the facts and circumstances confronting them." *Id*. at 397. "[P]roper application" of "[t]he test of reasonableness" in this context

> requires careful attention to the facts and circumstances of each particular case, including the *severity of the crime at issue*, whether the suspect poses an *immediate threat* to the safety of the officers or others, and whether he is *actively* resisting arrest or *attempting to evade arrest by flight*. *See Tennessee v. Garner*, 471 U.S.[ 1], 8-9 [(1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

*Graham*, 490 U.S. at 396 (other internal quotation marks omitted) (emphases ours); *see*, *e.g.*, *Rogoz*, 796 F.3d at 246; *Salim*, 93 F.3d at 91.

Though the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of

14

flight. *See, e.g.*, *Tracy*, 623 F.3d at 96-98 (officer entitled to qualified-immunity-based summary judgment with respect to claim that he jumped on a suspect who admittedly was attempting to flee, but not with respect to claim that--on the plaintiff's version of the events--he sprayed the suspect with pepper spray from inches away, when the suspect was in handcuffs). Thus, we have not applied the fleeing-suspect principle to one who is no longer fleeing.

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97. "The 'reasonableness' of" the amount of force used thus "must be judged from the perspective of a reasonable officer on the scene . . . . at the moment" the force is used. *Id*. at 396; *see, e.g.*, *Rogoz*, 796 F.3d at 246-47; *Tracy*, 623 F.3d at 96; *O'Bert*, 331 F.3d at 37, 40.

C. *The Appeals of the Present Defendants*

Within the above framework, we conclude that Csech's appeal from the denial of his motion for summary judgment on the basis of qualified immunity is properly before us but that the other appeals are not, and that Csech was entitled to summary judgment.

1. *Csech's Deployment of His Taser*

The complaint alleges without qualification--and Defendants admit--that Csech "fired his taser gun, from behind, striking Mr. Soto," "while chasing Mr. Soto." (Complaint ¶ 17; *see* Answer ¶ 17.) There is thus no dispute as to the fact that when Csech shot Soto with his taser, Soto was fleeing.

15

As the district court noted, no precedent as of January 23, 2008, established that a suspect who was fleeing had a right not to be stopped by means of a taser. There being no remaining material facts to be determined with respect to the excessive force claim against Csech, the undisputed fact that Soto was fleeing when Csech tased him was therefore dispositive. Csech should have been granted summary judgment on the basis of qualified immunity, dismissing this claim against him.

2. *The Taser Deployments by Stepniewski and Robinson*

Although Stepniewski and Robinson argue that they too were entitled to summary judgment based on qualified immunity because it was not clearly established that taser deployments against "fleeing" suspects were unconstitutional (*e.g.*, Defendants' brief on appeal at 2, 41-53), there is no allegation in the complaint similar to the ¶ 17 allegation about Csech. Rather than alleging that Stepniewski and Robinson, when they fired their tasers, were chasing Soto or that Soto was still fleeing, the complaint alleges that Soto had fallen to the ground upon being tased by Csech and that Stepniewski and Robinson then tased Soto "[w]hen Mr. Soto, who posed no physical threat to the officers pursuing him, attempted to return to his feet" (Complaint ¶ 18). While denying that Soto posed no threat, Defendants in their answer admitted that Stepniewski and Robinson tased Soto while he was "attempting to return to his feet." (Answer ¶ 18.)

Defendants argue that Stepniewski and Robinson tased Soto because he had been fleeing and they believed he might be about to attempt to resume flight or might pose a threat of harm to the Officers. In aid of their argument, Defendants maintain, as they did in the district court, that Soto was the driver of the Camry (*see*, *e.g.*, Defendants' brief on appeal at 9, 10; Defendants' SJ/QI Mem. at 1, 3, 34), that the driver had sought to flee in the Camry, and that on Fairfield Avenue they

16

believed he had attempted to hit the police cars coming toward him. (*See*, *e.g.*, Defendants' SJ/QI Mem. at 3 ("For the sake of clarity, Defendants note *Mr. Soto was the driver* of the stolen Camry who committed the felony crime of assaulting a police officer when he swerved the Camry at Officer Csech's vehicle." (emphasis added)).) However, whether Soto was the Camry's driver--which is disputed, and which Defendants' Rule 56.1 Statement, *see* D. Conn. Local Rule 56(a)(1), did not assert was undisputed--is far from clear. Young, the other captured occupant, stated that the driver of the Camry was a man named "Jose," not Israel Soto. (Transcript of Young OIA interview, sworn to April 17, 2009 ("Young Aff."), at 2, 9.) Further, any notion that Stepniewski might have assumed that Soto had been the driver of the Camry on the theory that there were no other occupants is dispelled by the fact that during the chase, Stepniewski radioed that he had seen something thrown from the Camry's window by "the front passenger" (Transcript of Stepniewski OIA interview, sworn to July 31, 2008, at 2). Finally, although Heanue--who had once arrested Soto some eight years earlier--told OIA in February 2008 that he had thought the Camry driver might be Soto, he did not mention that thought in his radio transmissions (*see* Deposition of Martin Heanue at 217); he testified that when he saw the Camry, he "did not have enough . . . visual contact to make a positive ID on any of the individuals within that car" (*id*.); and he told OIA that "when we got to Seaside, you couldn't see squat" (Transcript of Heanue OIA interview, sworn to July 17, 2008, at 8).

Defendants also suggest that Soto may have posed a threat of injury to the Officers because he may have had a gun. But none of the Officers said they observed any sign of a weapon or any gesture by Soto that suggested a weapon. (*See*, *e.g.*, Deposition of Chris Robinson, July 31, 2013 ("Robinson 7/31 Dep."), at 145 ("I never saw a weapon on him" and never saw him make a movement

17

as if he had a weapon); Deposition of Damien Csech ("Csech Dep."), at 101 (Csech "never saw a weapon on the person who [he] TASERed").)

Finally, Defendants, arguing relentlessly that there was no established law against using their tasers on a "fleeing" suspect (*e.g.*, Defendants' brief on appeal at 2, 20, 21, 22, 41, 42, 43, 44, 46, 47), have not accepted for purposes of this appeal plaintiff's view that Soto, at the moment Stepniewski and Robinson tased him, was neither threatening nor fleeing, and they do not they describe the record in the light most favorable to the plaintiff.  For example, there was testimony from Young that Soto had become both incapacitated and compliant.  In his OIA interview, Young stated that at some point after he fled from the Camry he saw that Soto, having run in the opposite direction, had fallen and had not gotten up.  (*See* Young Aff. at 10.)

The record also includes deposition testimony from Csech, Stepniewski, and Robinson, indicating that when Stepniewski and Robinson tased Soto, they were within arm's reach of him and he was on the ground, in no position to flee.  After Csech tased Soto, all three of those Officers ran toward Soto--with Stepniewski and Robinson three-to-five feet from each other (*see*, *e.g.*, Robinson 7/31 Dep. at 40-41, 44) and Csech between them (*see*, *e.g.*, Csech Dep. at 199, 201)--and Stepniewski and Robinson tased Soto from as close as two feet away.  (*See*, *e.g.*, Deposition of Chris Robinson, July 30, 2013 ("Robinson 7/30 Dep."), at 100 ("Q. And the two of you . . . TASERed Israel Soto from behind?  A. No.  He was laying on the ground, getting up."); *id*. at 138 ("he hadn't gotten up yet"; "his hands were still on the ground"); Transcript of Robinson OIA interview, sworn to February 19, 2009 ("Robinson Aff."), at 13 ("When I tased him, he was down; he was . . . trying to like push up, get up."); Robinson 7/31 Dep. at 128 (when he saw Soto make that movement, Robinson was "three to five feet" away from Soto); *id*. at 39 ("Q. [Stepniewski] . . . and you were both a couple of feet away

18

from the person that was TASERed? A. Yes."); Robinson 7/30 Dep. at 105 ("I know I tased him once," "from about two feet away").)

In light of this evidence, a rational juror could find that, when Stepniewski and Robinson fired their tasers, Soto had never given any indication of possessing a weapon and was not fleeing; that Soto was on the ground, completely entangled in taser wires (*see* Robinson Aff. at 5 ("there were wires everywhere")), struggling even to get into a push-up position; and that with Stepniewski and Robinson in such close proximity to Soto in those circumstances, the firing of their tasers constituted objectively unreasonable use of force.

The district court's ruling that the evidence, taken in the light most favorable to the plaintiff, was sufficient to create triable issues relevant the entitlement of Stepniewski and Robinson to qualified immunity is not immediately appealable.

3. *Robinson's Collision with Soto*

Defendants argued that Robinson was entitled to qualified immunity and summary judgment "arising out of *his accidental* collision with Mr. Soto because *accidentally striking* a fleeing suspect with a police vehicle does not constitute a Fourth Amendment seizure." (Defendants' SJ/QI Mem. at 26-27 (emphases added).) The district court did not reject the principle that the Fourth Amendment does not encompass a use of force that was not intentional. *See generally Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("a Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement *through means intentionally applied*" (emphasis in original)). Rather, the court ruled that there was a genuine issue of fact to be tried as to whether or not Robinson hit Soto intentionally; and the applicability of the accidental-contact principle

19

would depend on an assessment of Robinson's credibility, a matter for a factfinder, not for the court on a motion for summary judgment. (*See* Part I.C. above.)

Defendants argue that plaintiff "produced no direct or circumstantial evidence that Robinson intentionally struck Soto" (Defendants' brief on appeal at 24); but a factfinder's assessment of a party's credibility may be influenced by internal inconsistencies in his factual presentation, and there are several here in the defense descriptions of the collision. Robinson's OIA interview with respect to the collision between his car and Soto contained apparent inconsistencies, as Robinson described what happened after Soto "got hit by" the cruiser (Robinson Aff. at 13) but also stated that Soto instead ran into the cruiser. Robinson's statements to OIA included the following:

- "[OIA Question:] [W]hen you struck the suspect, he fell backwards, hitting his head, is that your conclusion? ROBINSON: Yes." (Robinson Aff. at 13);

- Soto fell backwards "after he got hit by the vehicle" (*id*. at 13);

- "[OIA Question:] When you hit him, you said he fell back? ROBINSON: He fell back" (*id*. at 15);

- "When I hit him, he went back" (*id*. at 17).

But then Robinson also stated:

- "[OIA Question:] You ran into him? ROBINSON: The vehicle...he ran into me actually" (*id*.);

- "He ran into me. I was coming to a stop" (*id*.);

- "I come to a stop" (*id*.);

- "He . . . hit[] the car" (*id*. at 17-18);

- "[H]e ran into me. I didn't run into him" (*id*. at 18).

Robinson's deposition testimony underwent a similar revision. He at first testified that "as soon as I

20

basically hit him, the car stopped" (Robinson 7/30 Dep. at 184); but he thereafter testified that "Soto ran into [my] cruiser" (Robinson 7/31 Dep. at 26).

In sum, with respect to the moment of the collision, Robinson testified that his car was stopped, or was coming to a stop, or stopped as soon as it hit Soto; and that the cruiser hit Soto, or Soto ran into the cruiser.

Csech was a witness to the collision, and the path of his description resembled that of Robinson, beginning with statements that Soto was struck by Robinson's cruiser and ending with statements that Soto had not in fact been struck but instead had run into the cruiser. In his 2008 OIA interview, Csech testified that Soto ran in front of Robinson's car and "got hit by the car" (Transcript of Csech OIA interview, sworn to February 23, 2009, at 3). He said, "I observed the male run in front of the Police vehicle" and "[g]et hit. Get knocked to the ground." (*Id*. at 6.) And in his 2013 deposition, Csech initially testified similarly:

■ Soto "ran in front of the police vehicle and was struck and knocked to the ground" (Csech Dep. at 161);

■ Csech "saw [Soto] get hit by the car, knocked to the ground," knocked back "a couple feet" (*id*. at 181).

However, Csech later maintained instead that

■ Soto "didn't get hit by the police car"; "he ran into the police car" (*id*. at 213);

■ "he ran into it" (*id*. at 214);

■ "Soto ran into the police vehicle" (*id*. at 227).

Lieutenant Thomas Lula, a supervisor of the Officers, testified in his OIA interview that, shortly after the final tasing of Soto, Lula was informed by a sergeant other than Stepniewski that Robinson had "struck this individual with his patrol car" (Transcript of Lula OIA interview, sworn to

21

June 25, 2009, at 4). When Lula inquired of Stepniewski, the response was that "Robinson came up to Stepniewski and told him listen, you know[,] I hit the guy." (*Id.*)

As noted in *Graham*, "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving." 490 U.S. at 397. Robinson, driving down Park Avenue looking for suspects, faced the need to make just such a judgment when he saw a fleeing suspect suddenly appear in front of his car. Did he brake and swerve in an effort to avoid hitting the suspect and strike him accidentally? Or did he stop the cruiser, only to have Soto run into it? Or did he decide to take advantage of the opportunity to stop the suspect by hitting him with the cruiser?

Robinson's own statements support an inference that his cruiser struck Soto. And the revisions of that aspect of his earliest statements may cast doubt on the credibility of his assertions that his collision with Soto was accidental. The district court's ruling that the record evidence is sufficient to require a trial on these issues affecting the applicability of the accidental-contact principle is not immediately appealable.

4. *The Qualified Immunity Contentions of Gaudett and the City*

Both Gaudett--who was not alleged to have had any personal involvement in the events concerning Soto--and the City also sought summary judgment dismissing the claims alleging deliberate municipal indifference enabling the Officers' alleged constitutional violations. The district court denied their motions because of the presence of genuine issues of material fact to be tried. On appeal the City and Gaudett argue that they should have been granted summary judgment on the ground of qualified immunity. We dismiss their appeals for lack of appellate jurisdiction.

22

The defense of qualified immunity protects a government official, sued for actions he took under color of state law, from claims for damages against him in his individual capacity. That defense does not belong to the governmental entity; the entity itself is not allowed to assert that defense. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *id*. at 657 ("municipalities have no immunity from damages liability flowing from their constitutional violations"); *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999) ("municipalities have no immunity defense, either qualified or absolute, in a suit under § 1983"). And since a suit against a government official in his official capacity is the equivalent of a suit against the government entity, *see generally Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), the defense of qualified immunity is also unavailable to the individual sued in his official capacity, *see, e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993).

An immediate appeal from the denial of a qualified-immunity-based motion for summary judgment is permitted only if the defendant's claim of qualified immunity is "substantial." *E.g.*, *In re State Police Litigation*, 88 F.3d at 124; *see Mitchell*, 472 U.S. at 525-27 (principles allowing immediate appeal of the denial of a "substantial" defense of absolute immunity are applicable to the defense of qualified immunity). The claims of Gaudett and the City of entitlement to qualified immunity, a defense that is doctrinally inapplicable to them, are not "substantial." Their appeals are dismissed for lack of appellate jurisdiction.

CONCLUSION

We have considered all of Defendants' arguments on this appeal and, except as indicated above, have found in them no basis for appellate jurisdiction. To the extent that the order of the district court denied summary judgment to Csech, it is appealable and is reversed. In all other respects, the appeal is dismissed.