18-3775
*Jones v. Treubig*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2019

(Argued: December 11, 2019     Decided: June 26, 2020)

No. 18-3775

—————————————————————

MATTHEW JONES,

*Plaintiff-Appellant*,

— v. —

LIEUTENANT CHRISTOPHER TREUBIG,

*Defendant-Appellee*,

CITY OF NEW YORK, POLICE OFFICER ADAM MUNIZ, POLICE OFFICER
MICHAEL VACCARO, UNDERCOVER OFFICER #349, POLICE OFFICER JOHN DOE
#1, POLICE OFFICER JOHN DOE #2, POLICE OFFICER JANE DOE, OFFICER JOHN
DOE #2,

*Defendants.*

—————————————————————

Before:          CABRANES, BIANCO, *Circuit Judges*, and REISS, *District Judge*.[*]

Plaintiff-appellant Matthew Jones appeals from a judgment of the United
States District Court for the Southern District of New York (Koeltl, *J.*).  The
complaint, brought under 42 U.S.C. § 1983, alleged that defendant-appellee

———————————

[*] Judge Christina Reiss, of the United States District Court for the District of
Vermont, sitting by designation.

Lieutenant Christopher Treubig and other police officers used excessive force during the course of an arrest. The jury found that Lt. Treubig used excessive force against Jones when he deployed two taser cycles against him, but found that the other officers were not liable. On November 21, 2018, the district court granted Lt. Treubig's motion for judgment as a matter of law on qualified immunity grounds. Because we conclude that at the time of the incident, the law was clearly established that a police officer cannot use significant force against an individual who is no longer resisting arrest and poses no safety threat, and the evidence allowed the jury to reasonably conclude that Jones was no longer resisting arrest and was not a safety threat to the officers or others at the time of Lt. Treubig's second use of the taser against him, we **REVERSE** the district court's judgment and **REMAND** for proceedings consistent with this opinion.

AMIR ALI, Roderick & Solange MacArthur Justice Center, Washington, DC (David Zelman, The Law Office of David Zelman, Brooklyn, NY, and Alexis Padilla, The Law Office of Alexis Padilla, Brooklyn, NY, *on the brief*) *for Plaintiff-Appellant*.

SUSAN PAULSON (Richard Dearing, Devin Slack, and Eric Lee, *on the brief*) *for* James E. Johnson, Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellee*.

JOSEPH F. BIANCO, *Circuit Judge*:

Matthew Jones ("Jones") appeals from the judgment entered on November 27, 2018 in the United States District Court for the Southern District of New York in favor of Lieutenant Christopher Treubig ("Lt. Treubig"). After a jury found that

Lt. Treubig used excessive force against Jones, the district court granted his motion for judgment as a matter of law on qualified immunity grounds.

The underlying claims stem from an arrest that occurred on April 7, 2015 in Jones's apartment building in East Harlem, New York, during which Jones was subjected to force by the police, including the use of a taser by Lt. Treubig. Jones filed the instant lawsuit under 42 U.S.C. § 1983, alleging that Lt. Treubig and other police officers (collectively, "defendants") deprived him of his rights under the Fourth and Fourteenth Amendments by using excessive force against him during the arrest. At the close of evidence at trial, defendants made a motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a), on qualified immunity grounds. The district court denied the motion without prejudice and submitted the case to the jury. The jury returned a verdict, holding Lt. Treubig liable for excessive force, awarding nominal and punitive damages against Lt. Treubig, and finding in favor of the remaining defendants. After Lt. Treubig renewed his Rule 50(b) motion for judgment as a matter of law, the district court granted the motion, finding Lt. Treubig was entitled to qualified immunity because, at the time of the arrest, there was no clearly established law that using a taser two times in rapid succession constituted excessive force under the particular

3

circumstances of this case. Jones appeals from the judgment. Because we conclude that it was clearly established at the time of the incident that an officer could not use significant force against an individual who was no longer resisting arrest and posing no threat to the safety of officers or other individuals, and the evidence allowed the jury to reasonably conclude that Jones was no longer resisting arrest and was not a safety threat at the time of Lt. Treubig's second use of the taser against him, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the record on appeal and are construed in the light most favorable to Jones unless otherwise noted. *See Kerman v. City of New York*, 374 F.3d 93, 114 (2d Cir. 2004). Jones lives in an apartment building in East Harlem, New York. On the evening of April 7, 2015, he was descending the stairs of his apartment building to meet his uncle to return a bottle of prescription medication and $70 in cash. As Jones met his uncle in the stairwell, New York Police Department ("NYPD") Officers Michael Vaccaro and Adam Muniz encountered them while patrolling the building. The officers instructed Jones and

4

his uncle to step from the stairwell into the building hallway, and both men complied. Jones then consented to be searched, and the officers found the bottle of medication that Jones was returning to his uncle. According to Jones, Officer Vaccaro said "jackpot" upon finding the pill bottle, and arrested Jones. J. App'x at 26. At that point, Jones's uncle ran, and the officers handcuffed Jones's right arm as Jones questioned what he did wrong. The officers asserted that Jones then "tried to turn around" and "take a swing at" Officer Vaccaro, and Officer Vaccaro conducted a "sweep kick" in response, bringing Jones to the ground. J. App'x at 49-50. As Jones was on the floor, Officer Vaccaro was on top of him, keeping Jones pinned to the ground face down. Jones's left arm remained uncuffed during the incident, despite the officers' attempts to handcuff it.

Other police officers quickly arrived at the scene in response to a radio call from Officer Vaccaro, including Undercover Officer #349 ("UC #349") and her partner. As Jones remained pinned down by Officer Vaccaro, another officer hit Jones with an expandable metal baton (referred to as an "asp") until Jones's left arm went numb. Officer Vaccaro testified that, as the officers attempted to secure Jones's left arm for cuffing, Jones stated, "I'm not going to jail." J. App'x at 51. One of the officers then pepper-sprayed Jones in his face. The officer who used

5

the asp and the officer who used the pepper spray were never identified. Although the officers testified that Jones was actively resisting arrest and refusing to produce his arms for handcuffing, Jones disputed those facts at trial, testifying that he was beaten with a baton and sprayed in the face with pepper spray after he had fallen to the ground and could not give them his left arm for handcuffing because it was under his body.

Lt. Treubig and his partner then arrived on the scene, and Lt. Treubig announced that he was going to use his taser. Jones claimed that he did not hear the warning, and managed to "force [himself] up off the ground" when he heard someone say, "hit him." J. App'x at 28, 42. At that point, Lt. Treubig used his taser against Jones in "cartridge mode."[1] J. App'x at 87, 89. When Lt. Treubig deployed the taser the first time, two metal prongs struck Jones in his lower back, and an

---

[1] Lt. Treubig explained "cartridge mode" as follows:

> When you want to deploy it you put the "on" switch on. Depress the trigger. The prongs come out of the cartridge and then into the subject and then there's an electrical current that goes through and from the two prongs and it completes a circuit so the electric charges [enter] into the subject's body.

J. App'x at 87. Lt. Treubig further testified that the taser model that he deployed would result in approximately 1,200 to 1,600 volts of electricity entering Jones's body when he pressed the trigger.

electric charge cycled through him for five seconds. Jones testified that, as a result, "[he] fell back on the ground with [his] arms sprayed out in the air."[2] J. App'x at 28.

According to Lt. Treubig, the initial tasing "didn't stabilize [Jones] enough to the point where the officers were able to grab his hands." J. App'x at 84. Lt. Treubig then "[r]eassess[ed] the situation" and depressed the trigger of the taser again, thereby re-cycling the taser and sending another electrical charge into Jones's body.[3] J. App'x at 54, 84. After the second tasing cycle, Jones was handcuffed and brought to the hospital by ambulance. Approximately three minutes passed between the time that Officer Vaccaro radioed for assistance and the time that Lt. Treubig called for an ambulance. Jones was later charged with a controlled substance offense and resisting arrest. He was released without bond, and all charges were ultimately dismissed.

## II.    Procedural History

_____

[2] Although Officer Vaccaro asserted that Jones was still trying to pull his arm under his body to prevent handcuffing, he agreed that Jones was on the ground face down after the first tasing.

[3] Re-cycling the taser in cartridge mode did not entail deploying the taser a second time because the taser prongs were already in Jones's back; rather, Lt. Treubig only had to press the trigger of the taser again.

7

On October 16, 2016, Jones commenced this action in the United States District Court for the Southern District of New York, alleging that the police officers used excessive force in beating him, pepper-spraying him, and tasing him, in violation of 42 U.S.C. § 1983. The officers did not claim qualified immunity at either the motion to dismiss or summary judgment stage.[4]

A jury trial commenced on May 21, 2018, and the jury reached a verdict on May 24, 2018. At trial, Jones and the police officers vigorously disputed the degree of resistance that Jones offered during the incident; Jones claimed that he repeatedly inquired why he was under arrest, did nothing to resist, and was unable to provide his arm for cuffing because it was pinned under him on the ground, while the officers who testified claimed that he resisted arrest "aggressively and actively." J. App'x at 82. Defendants argued to the jury that they should not be held liable for two principal reasons. First, they contended that Jones could not identify which specific officer beat him with the asp and pepper-sprayed him, so no one could be held accountable for the force that preceded the tasing. Second, defendants urged the jury to credit their version of events in which

---

[4] "The absence of a motion for summary judgment is not a defect, however, as the absence of a motion for a directed verdict would be." *Krause v. Bennett*, 887 F.2d 362, 368 n.3 (2d Cir. 1989).

Jones was actively resisting arrest and such resistance justified their reasonable use of force.

### a. Jury Trial and Verdict

Following deliberations, the jury found that only Lt. Treubig used excessive force in violation of Jones's constitutional rights.[5] It found that Officers Vaccaro, Muniz, and UC #349 did not use excessive force against Jones. The jury did not award compensatory damages, and initially awarded Jones solely punitive damages against Lt. Treubig in the amount of $30,000. After the district court instructed the jury to reconsider the award of nominal damages, the jury awarded Jones twenty-five cents.

At the close of evidence, Lt. Treubig had requested that the district court dismiss the excessive force claim on qualified immunity grounds, and he renewed that motion after the jury returned its verdict. Over Jones's objection, the district court asked the following questions to the jury in a special verdict form to assist the district court in resolving the qualified immunity issue, and the jury provided the following answers:

1. Did Lieutenant Treubig say he would use the taser before he used it?

---

[5] On appeal, Lt. Treubig does not contest the jury's finding that he used excessive force.

A: Yes.
2. Was a second taser cycle needed to gain control of the plaintiff's arms?

A: No.
3. Did Lieutenant Treubig believe that a second taser cycle was needed to gain control of the plaintiff's arms?

A: Yes.
4. Was the plaintiff resisting arrest when Lieutenant Treubig used the taser the first time?

A: Yes.
5. Did Lieutenant Treubig believe that the plaintiff was resisting arrest when Lieutenant Treubig used the taser the first time?

A: Yes.
6. Was the plaintiff resisting arrest when Lieutenant Treubig used the taser the second time?

A: No.
7. Did Lieutenant Treubig believe that the plaintiff was resisting arrest when Lieutenant Treubig used the taser the second time?

A: Yes.

J. App'x at 137-38, 185-88. In short, the jury found that Jones was resisting arrest at the time that Lt. Treubig first used the taser. The jury also found that Jones was not resisting when Lt. Treubig used the taser the second time and that the second taser cycle was not needed to gain control of Jones's arms for handcuffing, but that Lt. Treubig believed the opposite to be true as to both facts.

As to his renewed motion for judgment as a matter of law, Lt. Treubig argued that the jury's answers demonstrated that he was entitled to qualified immunity. Given his belief that Jones was resisting arrest throughout the entire

10

incident, Lt. Treubig asserted that the district court should find that his mistaken belief was reasonable under the circumstances even as it related to the second use of the taser. In response, Jones argued, in part, that subjective beliefs were not relevant to qualified immunity; rather, the reasonableness of any perceived facts related to whether Lt. Treubig used excessive force in the first place—a question already answered against Lt. Treubig by the jury. Moreover, even though the jury found that Jones was resisting before the first taser cycle, Jones asserted that it was not clear from the verdict form whether "resisting arrest" meant passive resistance, in line with Jones's theory, or active resistance, in line with defendants' theory. In particular, Jones highlighted a portion of Lt. Treubig's testimony when he was asked for details of Jones's "active" resistance, to which Lt. Treubig responded that Jones had refused to "comply with the officers' orders" and "to place his hands behind his back and he was refusing those orders." J. App'x at 82. Such passive resistance, according to Jones, did not justify the use of force applied. Jones further contended that, even if qualified immunity applied to the first use of the taser, it did not apply to the re-cycling of the taser when Jones (as the jury found in the special interrogatory) was no longer resisting.

**b. The District Court's Ruling**

11

On November 21, 2018, the district court granted Lt. Treubig's motion for judgment as a matter of law on qualified immunity grounds. The district court stated that the "operative question" was whether "the law was clearly established" at the time of the incident in April 2015 "such that his use of a taser two times in rapid succession while assisting in the arrest of the plaintiff constituted excessive force in violation of the Fourth and Fourteenth Amendments, so that any reasonable officer in the defendant's position would have understood that the officer was violating the plaintiff's rights." J. App'x at 159-60. As to the first taser cycle, the district court found that Lt. Treubig did not violate clearly established law because he had "no 'fair warning' that the first use of the taser violated the plaintiff's constitutional rights" given Jones's resistance. J. App'x at 163 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Turning to the second tasing, the district court held that Lt. Treubig was entitled to qualified immunity because "there is nothing in the cases from the Supreme Court or the Court of Appeals for the Second Circuit that gave 'fair warning' that the second use of the taser was unconstitutional at the time of the plaintiff's arrest." J. App'x at 164. First, the district court found that the re-cycling of the taser was reasonable because the first tasing did not "subdue the plaintiff

sufficiently to finish placing handcuffs on him" and "[t]he plaintiff was rising from the floor at the time." J. App'x at 164. Moreover, although the jury found in a special interrogatory that Jones was not resisting arrest, the district court noted that the jury also found in those interrogatories that Lt. Treubig mistakenly believed otherwise. The district court further concluded that Lt. Treubig's mistaken view of resistance at the point when he re-cycled the taser was "reasonably believed," and did not preclude his entitlement to qualified immunity. J. App'x at 174. Thus, after examining the record and the case law, the district court concluded that "[t]here is no basis to find that Lt. Treubig was an unreasonable officer." J. App'x at 165.

After reaching this reasonableness conclusion, the district court explained that the punitive damages award did not prevent the court from granting judgment as a matter of law. Specifically, the district court stated that qualified immunity is a question of law for courts that pertains to the conduct of reasonable officers, while punitive damages pertain to the "subjective motivation of a defendant's actions." J. App'x at 177-78.

This appeal followed.

## DISCUSSION

Jones appeals the district court's order granting judgment as a matter of law to Lt. Treubig on qualified immunity grounds. Jones argues on appeal that, in its decision, the district court incorrectly drew inferences in favor of Lt. Treubig, despite the standard of review that applies to motions for judgment as a matter of law. For example, Jones asserts that the district court erred when it stated that "[t]he parties agree that despite being tased, the plaintiff was not incapacitated." J. App'x at 153. Jones contends that the parties agreed that Jones attempted to push himself off the ground at the time of the *first* tasing, but "whether the initial deployment of the taser incapacitated Mr. Jones was a hotly disputed issue." Appellant Br. at 18 n.6. The district court further stated that, after the first tasing, "[t]he plaintiff maintained control of his arms and began pushing himself off the ground." J. App'x at 153. However, Jones highlights portions of the testimony in which he asserted that he was lying face down at the time of the second tasing. Jones argues accordingly that, when the jury's findings and the evidence supporting those findings are correctly construed in the light most favorable to him, Lt. Treubig is not entitled to qualified immunity because he violated clearly established law by (1) using his taser the first time even though Jones was only

14

engaged in "passive resistance," and by (2) re-cycling his taser when Jones had already been subdued on the ground and could not be reasonably perceived as continuing to resist arrest.

We review *de novo* a district court's decision on a Rule 50(a) motion for judgment as a matter of law, as well as its decision to grant qualified immunity, *Dancy v. McGinley*, 843 F.3d 93, 105 (2d Cir. 2016), and we apply the "same standard as the district court itself was required to apply," *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000). Accordingly, in the context of a Rule 50(a) motion, we must "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) (quotation marks omitted).

## I. The Qualified Immunity Standard

Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)).  Thus, pursuant to the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), when an official raises qualified immunity as a defense, the court must consider whether: "(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct."  *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

As it relates to the second step, the focus is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.[6]  The Supreme Court has explained that the "clearly established right," particularly in excessive force cases, "must be defined with specificity."  *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).  Indeed, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)).  Although the Supreme Court "do[es] not require a case directly on point, . . .

---

[6] We have noted that this question is not a separate inquiry, but rather part of the second step of the qualified immunity analysis.  *See Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 n.11 (2d Cir. 2009); *see also Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012).

existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Francis v. Fiacco*, 942 F.3d 126, 145-46 (2d Cir. 2019). In determining whether a right is clearly established at the time of the conduct in question, we can consider Supreme Court decisions and our own decisions, as well as "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

The Second Circuit has set forth the procedure by which district courts should resolve disputes on factual issues at trial that are relevant to the qualified immunity analysis. In particular, "[i]f there are unresolved factual issues which prevent an early disposition of the defense [of qualified immunity], the jury should decide these issues on special interrogatories." *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990); *see also Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) ("We believe that use of special interrogatories in this case resolves the difficulty of requiring the jury to decide what the facts were that the officer faced or perceived and

17

requiring the court to make the ultimate legal determination of whether qualified immunity attaches on those facts." (quotation marks omitted)).

## II.     Clearly Established Law and the Use of Tasers

The first step of the qualified immunity test—namely, whether the defendant violated a statutory or constitutional right—was determined by the jury in this case, which found that Lt. Treubig used excessive force against Jones in violation of the Fourth and Fourteenth Amendments.  As stated above, Lt. Treubig does not appeal this finding.  Accordingly, our task here is to determine whether the right at issue was "clearly established"—that is, whether "it was objectively reasonable for [Lt. Treubig] to believe [his] acts did not violate those rights."  *See Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994).

Before the incident at issue here in April 2015, it was clearly established in this Circuit that it is a Fourth Amendment violation for a police officer to use significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others.  *Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010).  In *Tracy*, we confronted an arrest that occurred in 2000 and involved the use of pepper spray against an individual who asserted that he was already in handcuffs and "offering no further active resistance."  *Id.* at 98.  We concluded that

18

disputed issues of fact regarding the timing and circumstances of the officer's use of pepper spray precluded summary judgment on the excessive force claim. *See id.* ("[W]e conclude that a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force."). With respect to step two of the qualified immunity analysis, even though that issue was not raised by the defendant officer, we "note[d] that it was well established at the time of the underlying altercation that the use of entirely gratuitous force is unreasonable and therefore excessive, and in light of this precedent, we presume[d] that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Id.* at 99 n.5 (citation omitted).

Notwithstanding that the focus of this appeal is the use of a taser, not pepper spray, we have warned that "[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014) (quoting *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)); *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates [clearly] established

law even in novel factual circumstances.").  To that end, we have observed that "[s]ome measure of abstraction and common sense is required with respect to police methods and weapons in light of rapid innovation in hardware and tactics." *Terebesi*, 764 F.3d at 237 n.20; *see also Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 69 n.1 (2d Cir. 2018) ("[N]ovel technology, without more, does not entitle an officer to qualified immunity." (quoting *Edrei v. Maguire*, 892 F.3d 525, 542 (2d Cir. 2018))).

It is beyond doubt that any reasonable police officer would know that the use of a taser, like pepper spray, constitutes significant force.  *See, e.g., Abbott v. Sangamon Cty.*, 705 F.3d 706, 726 (7th Cir. 2013) ("[T]he use of a taser, like the use of pepper spray or pain-compliance techniques . . . falls somewhere in the middle of the nonlethal-force spectrum."); *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) ("The physiological effects, the high levels of pain, and foreseeable risk of physical injury lead us to conclude that the [Taser] X26 and similar devices are a greater intrusion than other non-lethal methods of force we have confronted" including, among other things, pepper spray.).  This obvious fact was known to Lt. Treubig, who testified that he was trained to "deploy the taser on individuals that are actively resisting, active aggression" or for "perceived violent threats."  J.

20

App'x at 87. It follows then that, after *Tracy*, any reasonable officer would understand that, because it violated clearly established law to use pepper spray against a non-resisting and non-threatening individual, the same would be true for the use of a taser.

In fact, *Tracy* itself made the broad scope of its holding abundantly clear. For example, in addressing the Fourth Amendment issue in *Tracy*, we did not only refer to pepper spray, but rather noted that the use of such a weapon constitutes a "significant degree of force" and emphasized that "a number of our sister circuits have made clear that [pepper spray] should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." 623 F.3d at 98 (collecting cases). Thus, the language in *Tracy* left no question that, on the issue of significant force against an arrestee no longer posing an immediate threat, we joined our sister circuits in concluding that summary judgment on the excessive force claim relating to the use of pepper spray was unwarranted for the defendant officer. *See id.* at 99. Moreover, in briefly addressing the second step of the qualified immunity analysis, we restated our holding "that the use of entirely gratuitous force is unreasonable and therefore excessive," *id*. at 99 n.5, and then, in *dicta*, noted that

21

our holding "was well established at the time of the underlying altercation,"[7] i*d*.

In other words, the explicit focus of *Tracy*'s Fourth Amendment analysis was on the officer's significant use of force in a gratuitous and excessive manner during an arrest, rather than the particular mode of that force. Therefore, following *Tracy*, it was clearly established that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others—whether such force was by pepper spray, taser, or any other similar use of significant force—violates the Fourth Amendment. *See generally Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 297 (S.D.N.Y. 2014) (concluding, after analyzing *Tracy* and other case authority, that "[i]t was . . . clearly established law in the Second Circuit as of April 2000 that it was a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety, regardless of whether that significant force

---

[7] We emphasize that we do not rely on any *dicta* in *Tracy* for the purpose of determining clearly established law; rather, we cite to this portion of the opinion, which reiterated the Court's holding under the Fourth Amendment, only to highlight the pervasive and clear nature of that holding throughout the opinion.

emanated from a pepper spray canister or the trigger of a taser"), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015).

In light of *Tracy*, we have held, as it relates to tasers, that it was clearly established before April 2015 that "officers may not use a taser against a compliant or non-threatening suspect." *Muschette*, 910 F.3d at 69-70 (citing *Tracy*, 623 F.3d at 96-98); *see also Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017) ("Though the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight." (citing *Tracy*, 623 F.3d at 96-98)). Although Lt. Treubig argues that these decisions are inapposite because they were issued after the conduct at issue here in April 2015, we disagree. For this argument, Lt. Treubig relies on the Supreme Court's decision in *Kisela*, which emphasized that cases published after the incident should not be considered in determining clearly established law "because a reasonable officer is not required to foresee judicial decisions that do not yet exist." *Kisela*, 138 S. Ct. at 1154. However, the Supreme Court's concern specifically related to opinions published after the officer's conduct at issue that establish the right *in the first instance*. *See id.* Consistent with the holding in *Kisela*, we have considered cases published after the conduct at issue that do not establish

23

a right in the first instance, but rather address whether a right was clearly established by case authority *before* the time of such conduct. *See Cobb v. Pozzi*, 363 F.3d 89, 111 (2d Cir. 2004) (concluding that the law "was clearly established in 1999" by relying on a 2002 decision that reaffirmed "a clearly established constitutional right" based on "conduct that had taken place *in 1998*" (quotation marks omitted)); *see also Terebesi*, 764 F.3d at 237 (relying in part on a 2010 decision that addressed the clearly established law as of 2005, although the conduct at bar occurred in 2008). In other words, we can rely on decisions that post-date Jones's arrest if they address whether the law concerning the use of a taser against a non-resisting individual was already established by *Tracy* in connection with police conduct that occurred prior to April 2015. Therefore, because both *Muschette* and *Soto* concluded that the right of a non-resisting, non-threatening arrestee to be free from an officer's use of a taser was clearly established for conduct in 2013 (in *Muschette*) and in 2008 (in *Soto*)—which are both prior to Lt. Treubig's conduct in 2015—those decisions have precedential force on this issue. In any event, we

independently reach the same conclusion regarding clearly established law under *Tracy* for the reasons already discussed.

## III.    Clearly Established Law in the Particular Context of this Case

Our holding regarding *Tracy* as it applies to tasers, however, does not end our analysis.  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *al-Kidd*, 563 U.S. at 742. Instead, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established," and, thus, "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotations marks omitted). Accordingly, we now turn to whether the right articulated in *Tracy* was clearly established in the more particular context in which the challenged conduct regarding the taser occurred in this case.

With respect to the second tasing cycle, the district court concluded that "there is nothing in the cases from the Supreme Court or the Court of Appeals for the Second Circuit that gave 'fair warning' that the second use of the taser was unconstitutional at the time of the plaintiff's arrest."  J. App'x at 164.  As discussed below, in reaching this conclusion, the district court erroneously relied upon a

25

factual finding—namely, that Jones was continuing to resist after the first tasing—that was rejected by the jury in a special interrogatory and is inconsistent with the trial evidence as construed most favorably to Jones, which is the applicable standard on a Rule 50 motion. Moreover, the district court relied upon the fact that "[t]he jury found that Lt. Treubig believed—although incorrectly—that the plaintiff was resisting arrest and that the second use of the taser was needed to gain control of the plaintiff's arms." *Id*. A mistake of fact, however, in the absence of an additional jury finding that the mistake was reasonable (when there are disputed material facts on that question) is insufficient to support an officer's claim that he is entitled to qualified immunity, and no such finding of reasonableness was made by the jury here. Similarly, for the reasons provided below, the fact that the re-cycling of the taser followed in rapid succession after the first tasing and that Jones was unhandcuffed at the time of the re-cycled taser does not undermine our qualified immunity analysis in this case. For the reasons explained below, we hold that, after considering the jury's factual findings in the special interrogatories and construing the evidence regarding the remaining factual disputes most

favorably to Jones, Lt. Treubig's second use of the taser under the particular circumstances he confronted violated clearly established law.[8]

### a. The Level of Resistance Before the Second Tasing

A critical fact for purposes of qualified immunity in this case is whether Jones was resisting arrest in any way at the time of the second tasing, because there was no clearly established law that would fairly warn police officers that a taser could not be used against a resisting arrestee. Indeed, to the contrary, "[o]ur precedents suggest that it is *not* excessive force to deploy tasers, after a warning, against arrestees who are dangerous or resisting arrest." *Penree by Penree v. City of Utica*, 694 F. App'x 30, 33 (2d Cir. 2017) (addressing a 2012 incident); *see also MacLeod v. Town of Brattleboro*, 548 F. App'x 6, 8 (2d Cir. 2013) (concluding that the use of a taser "to subdue an actively non-compliant suspect . . . who posed a real and imminent threat to the safety of the officers and any bystanders" was objectively reasonable where the officers gave "repeated, clear commands that [the plaintiff] return to the ground"); *Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d

---

[8] Jones also argues that the district court erred in holding that Lt. Treubig was entitled to qualified immunity with respect to the first tasing. Given our conclusion that there is no qualified immunity for the second tasing and that the jury's verdict on the excessive force claim should be reinstated, we need not address this alternative argument.

Cir. 2010) (concluding that the use of taser was reasonable where protestors "were actively resisting their arrest" when they chained themselves to a barrel drum and the "apparently imminent arrival of some number of their compatriots added a degree of urgency" to the situation).  On the other hand, if Jones was no longer resisting arrest and posed no threat to the safety of police officers or others after the first tasing, then qualified immunity would not protect Lt. Treubig when he re-cycled the taser in violation of the clearly established law under *Tracy*.

Thus, a factual lynchpin to the district court's qualified immunity analysis was its post-trial conclusion, with respect to the second tasing cycle, that "[t]he plaintiff was rising from the floor at the time." J. App'x at 164.  In connection with this factual finding, the district court suggested that Jones conceded that he still exhibited a certain level of ongoing resistance after the first tasing:

> The parties agree that despite being tased, the plaintiff was not incapacitated.  The taser did not stabilize the plaintiff enough for the officers to be able to grab his hands.  The plaintiff continued to try to pull his right arm away from the officers and under his body after the first taser cycle.  The plaintiff maintained control of his arms and began pushing himself off the ground.  The defendant reassessed the situation and believed that the plaintiff was still resisting arrest.  The defendant then recycled the taser.

J. App'x at 153 (citations omitted).

28

There was no such concession, however, to these facts by Jones. It is correct that the parties agreed that Jones was pushing himself off the ground at the time of the *first* tasing. *See* J. App'x at 148 (defense counsel conceding that "[a]t least with respect to the initial taser cycle, the record is clear that, from the stipulated facts, . . . the plaintiff was pushing up off of the ground"). In contrast to the first tasing, Jones asserts on appeal, and argued to the jury below, that he was already "subdued face down, arms spread" at the time of the *second* tasing. Appellant Br. at 22; *see also* J. App'x at 107 (plaintiff's counsel arguing to the jury that Jones was "lying face down on the ground unarmed posing no threat" at the time of the second tasing). Thus, there was no agreement by the parties regarding the circumstances immediately prior to the second tasing; rather, Jones's level of resistance at the time of the second tasing, if any, was a disputed key issue at trial.

Even in the absence of an agreement on this factual issue, Lt. Treubig suggests that the uncontroverted evidence still demonstrated that Jones continued to resist arrest at the time of the second tasing. Lt. Treubig supports his position by pointing to Jones's own trial testimony in which he stated that, after the first tasing, though he felt the muscles in his legs and his back "lock[] up," the muscles in his arms did not. J. App'x at 43. Accepting Lt. Treubig's argument, the district

court failed to view that fact, and the other evidence surrounding the circumstances of the second tasing, in the light most favorable to Jones. As an initial matter, there was testimony that a single taser use has the capacity to completely incapacitate an individual. *See, e.g.*, J. App'x at 53-54 (explaining that the electricity from a single taser cycle can contract the victim's muscles or "lock up a person" to make them "go stiff"); J. App'x at 84 (Lt. Treubig affirming that a single tasing can "fully incapacitate a grown man"). More importantly, consistent with that capacity, Jones specifically testified that, after the first tasing, he "fell out" and dropped "on the ground with [his] arms sprayed out." J. App'x at 28. Testimony from Officer Vaccaro also established that Jones was face down at the time of the second tasing (although Officer Vaccaro disputed other aspects of Jones's account).

Although Lt. Treubig places great weight on the fact that Jones also testified that his arm muscles did not lock up when he was on the ground after the first tasing, that alone cannot possibly establish that he was resisting arrest in any way at the time of the second tasing. Indeed, Jones counters that "the jury plainly could have inferred that a man lying face down with his back and legs locked up is incapacitated irrespective of the sensation he recalled in his arms." Reply Br. at 8.

30

We agree with Jones's assertion regarding this permissible inference by the jury from the record. In other words, the question is not how Jones's arms felt, but rather what, if anything, his arms were doing as he lay on the ground after the first tasing, and what Lt. Treubig reasonably observed in that regard. On that issue, Jones testified that his arms were "sprayed out" as he dropped to the ground, J. App'x at 28, and thus doing nothing, which would not have provided a reasonable officer with any basis to conclude from the outward appearance of Jones's arms that he was resisting arrest or posing any ongoing threat to the officers after the initial tasing.[9]

Not only was there evidence in the record to support that Jones was no longer resisting arrest at the time of second tasing, but the jury made that specific factual finding in a special interrogatory. Because that jury finding was rationally supported by the above-referenced evidence in the record (if credited), it must be accepted for purposes of the qualified immunity analysis utilizing, to the extent any other factual issues remain, the underlying evidence in the light most favorable to Jones. *See Kerman*, 374 F.3d at 114. Upon doing so here, our qualified

---

[9] In addition, the testimony at trial established that there were six officers on the scene when Lt. Treubig used his taser both the first and second time, thus allowing for the reasonable inference that even if the charge did not fully incapacitate Jones's arms, there was a sufficient number of officers present to effect the arrest.

immunity analysis must assume that, even though Jones may have been resisting arrest during the initial parts of the police encounter up to the time of the first tasing, when Lt. Treubig re-cycled his taser and sent another electric shock through Jones, he was no longer trying to get off the ground, no longer actively resisting arrest, and no longer posing a threat to the police officers. Instead, construing the evidence most favorably to Jones, at that point, he was face down on the ground with his arms spread. On those facts, no reasonable officer could believe that the use of the taser a second time against Jones was lawful.

### b. Lt. Treubig's Belief Regarding the Level of Resistance Before the Second Tasing

In reaching this conclusion, we have also carefully considered the second ground for qualified immunity articulated by the district court—namely, even though the jury found that Jones was not resisting arrest at the time of the second tasing, Lt. Treubig is still entitled to qualified immunity because the jury also found Lt. Treubig mistakenly believed that Jones was continuing to resist. The district court explained that Lt. Treubig's mistaken belief in that regard "does not preclude a determination that Lt. Treubig is entitled to qualified immunity." J. App'x at 164. However, in the absence of more detailed findings by the jury, we conclude that this mistaken belief does not shield Lt. Treubig from liability because

the evidence in the record, when construed most favorably to Jones, would have allowed the jury to rationally find that Lt. Treubig's subjective belief regarding ongoing resistance at the time of the second tasing was unreasonable.

The Supreme Court has made clear that "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (quotation marks omitted). However, qualified immunity only protects "reasonable mistakes." *Saucier*, 533 U.S. at 206; *Moore v. Vega*, 371 F.3d 110, 117 (2d Cir. 2004) ("[D]efendants believed they were entering the residence of an absconded parolee. If such belief was reasonable, qualified immunity protects them from liability, even if that belief was mistaken."); *accord Singh v. Cordle*, 936 F.3d 1022, 1033 (10th Cir. 2019) ("A mistake of fact must, of course, be a reasonable one."); *Henry v. Purnell*, 652 F.3d 524, 532 (4th Cir. 2011) ("[I]t is not the honesty of [the police officer's] intentions that determines the constitutionality of his conduct; rather it is the objective reasonableness of his actions. It is certainly true that mistaken, but reasonable, decisions do not transgress constitutional bounds. All actions, however, mistaken or otherwise, are subject to an objective test." (citation omitted)).

Here, after finding in a special interrogatory that Jones was not resisting arrest at the time of the second tasing, the jury also found that Lt. Treubig believed that Jones was resisting arrest. J. App'x at 187. The jury was not asked, however, whether that mistaken belief was reasonable. Instead, the district court, in its post-trial Rule 50 decision, independently concluded that Lt. Treubig "reasonably believed that the plaintiff was still actively resisting arrest when he cycled the taser the second time," J. App'x at 174, without any additional findings by the jury in the special interrogatories to support the reasonableness determination. That was error.

As a threshold matter, we have explained that the reasonableness of a mistake of fact regarding the use of force does not pertain to the ultimate qualified immunity determination, but rather whether there was a constitutional violation in the first instance—which is "step one" of the *Saucier* inquiry. *See Stephenson*, 332 F.3d at 78 ("[A]s the Supreme Court clarified in *Saucier*, claims that an officer made a reasonable mistake of fact that justified the use of force go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity."); *see also Saucier*, 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely

to fight back, for instance, the officer would be justified in using more force than in fact was needed."). This question is in contrast to an officer's mistaken belief about the legality of the conduct, which is analyzed at "step two" in the *Saucier* framework. *See Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) ("Whether the officer is entitled to qualified immunity is resolved by the latter part of the *Saucier* analysis, which looks at an 'officer's mistake as to what the law requires[.]'" (quoting *Saucier*, 533 U.S. at 205)); *see also Stephenson*, 332 F.3d at 80 n.15 ("Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct.").

And, importantly, disputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury, while the reasonableness of an officer's view of the law is decided by the district court. *See Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) ("If there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury. If there is no material question of fact, the court decides the qualified immunity issue as a matter of law." (citations omitted)); *see also Cugini v. City of New York*, 941 F.3d 604, 614 n.6 (2d Cir.

35

2019) (concluding that, with respect to an excessive force claim regarding handcuffing, "[a] reasonable jury could also find that it was unreasonable for [the officer] to assume that the plaintiff was all right based on her silence following the handcuffing").

For example, in *Wilkins v. City of Oakland*, 350 F.3d 949, 953, 956 (9th Cir. 2003), the Ninth Circuit held that summary judgment on qualified immunity grounds was unwarranted, where officers mistakenly shot a fellow plain-clothes officer, because the jury needed to decide the reasonableness of that mistake. The court explained:

> The objective reasonableness of the officers' conduct in this case turns on their mistake of fact with regard to [the plain-clothes officer's] status and purpose at the scene that night. In turn, whether this mistake of fact was reasonable depends on which version of the facts is accepted by a jury. . . . The only question for resolution is whether their belief in the necessity of their actions was objectively reasonable. That is, was it reasonable for them not to understand that the person they were shooting was another police officer? Because the answer to that question depends on disputed issues of material fact, it is not a legal inquiry, but rather a question of fact best resolved by a jury.

*Id.* at 955; *see also Curley v. Klem*, 499 F.3d 199, 214 (3d Cir. 2007) ("At the risk of understating the challenges inherent in a qualified immunity analysis, we think the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified

immunity question is whether the officer was reasonably mistaken about the state of the law.").

Therefore, in determining whether Lt. Treubig used excessive force with respect to tasering Jones, it was the jury's role to consider the reasonableness of Lt. Treubig's stated belief regarding Jones's continued resistance at the time of the second tasing. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . at the moment" the force is used. (citations omitted)). In the instant case, consistent with that legal framework, the district court specifically instructed the jury on the need to consider the evidence at the arrest scene from the perspective of a reasonable officer. *See* J. App'x at 116 (instructing the jury that, "[b]ecause police officers are often forced to make split-second judgments about the amount of force that is necessary in a given situation, the reasonableness of a particular use of force must be judged from the perception of a reasonable officer on the scene rather than with the 20/20 vision of hindsight"). Given that the jury reached its verdict under the correct instructions, the district court cannot "substitute its view for adequately supported findings that were

implicit in the jury's verdict." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (quoting *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 430 (2d Cir. 1995)).

Although it is the jury's province to resolve the reasonableness of an officer's perception of the facts that confronted him, we recognize that those same facts, or some portion thereof, can also sometimes be critical in deciding the qualified immunity analysis at step two of *Saucier*. Put another way, the reasonableness of a particular mistake of fact may dictate whether any reasonable officer would have understood that his conduct was unlawful. In situations where the court may not be able to discern from the general verdict how the jury may have resolved a particular disputed issue that is a dispositive part of the step-two *Saucier* analysis, it is necessary (as the district court did here) to ask additional questions to the jury through special interrogatories. *See Stephenson*, 332 F.3d at 81.

Jones argues that, in finding in his favor on the excessive force claim, the jury necessarily implied that it found unreasonable any mistaken belief by Lt. Treubig about the facts (including additional resistance after the first taser) that allegedly prompted him to re-cycle the taser. Jones further asserts that any conceivable doubt about the jury's view on the reasonableness of Lt. Treubig's beliefs was eliminated by its award of punitive damages which required the jury

to conclude, at the very least, Lt. Treubig acted with "reckless disregard" for Jones's constitutional rights. J. App'x at 117; *see also id.* at 183. In the proceedings below, Jones thus objected to the district court even posing questions on this issue to the jury in the form of special interrogatories following the jury's general verdict in Jones's favor on the excessive force claim.[10] *See* J. App'x at 131 (plaintiff's counsel arguing, with respect to submitting special interrogatories to the jury, that "[i]t seems to me that those questions have already been answered through the jury's verdict, your Honor. All of those questions were part of this trial. They were all put to the jury. . . . So to the extent that I can object to those questions, I do. They're unnecessary.").

Jones's argument goes too far. In particular, Jones overlooks the fact that the jury was considering multiple uses of force by Lt. Treubig as part of one excessive force claim (i.e., an initial tasing and a re-cycling of the taser), and the

---

[10] Although the verdict form returned here by the jury on liability and damages was labeled as a "Special Verdict Form," J. App'x at 181, it was in reality a general verdict because it did not ask the jury for specific findings on any particular issue of fact on the excessive force claim, but rather simply asked whether the plaintiff proved the claim as to each defendant, *see* Fed. R. Civ. P. 49 (distinguishing between special and general verdicts); *see also Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 63 (1st Cir. 2002) (noting that, "[a]lthough the Verdict Form is entitled 'Special Verdict Form,' it seems clear that it was not a true 'special verdict,' as described in Rule 49(a) of the Federal Rules of Civil Procedure" because it contained no questions regarding specific findings of fact).

jury's general verdict against Lt. Treubig did not necessarily find that both acts violated the Fourth Amendment. Similarly, even assuming the general verdict against Lt. Treubig related to the second tasing, we would still not necessarily know from the general verdict how the jury resolved particular disputed issues, including the reasonableness of Lt. Treubig's belief that Jones was resisting arrest after the first tasing. For example, based upon the general verdict alone, the jury could have concluded that Lt. Treubig reasonably believed Jones was continuing to resist arrest, but that the re-cycling of the taser was an unreasonable amount of additional force given the level of resistance.

Here, for purposes of determining whether Lt. Treubig should have known that he violated clearly established law under *Tracy* as it relates to the second tasing, the critical issues at step two of *Saucier* are whether: (1) Jones was still resisting arrest at that time, or (2) even if Jones was no longer resisting arrest at that point, Lt. Treubig reasonably believed he was still resisting. Thus, in order to ensure that the jury decided both of those issues against Lt. Treubig within its general verdict, it was entirely appropriate to utilize special interrogatories to address those precise questions. As to the first issue, the jury's special interrogatory made clear that the jury concluded that Jones was not resisting arrest

at the time of the second tasing. However, as to the second issue regarding any reasonable mistaken belief as to that fact, the question was incorrectly phrased to the jury. The jury was asked, "Did Lieutenant Treubig believe that the plaintiff was resisting arrest when Lieutenant Treubig used the taser the second time?" J. App'x at 138, 187. Although the jury answered affirmatively to that question, such an answer is insufficient to shield Lt. Treubig with qualified immunity because his subjective mistake of fact, like a mistake of law, must be reasonable. *See generally Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that, for purposes of qualified immunity, the officer's "subjective beliefs about the [circumstances] are irrelevant"); *see also Outlaw v. City of Hartford*, 884 F.3d 351, 369 (2d Cir. 2018) ("[T]he federal standard for qualified immunity is what a reasonable officer in [the officer's] position would have believed, not what [the officer] himself believed.").

Thus, the jury should have been asked, "Did Lieutenant Treubig *reasonably* believe that the plaintiff was resisting arrest when Lieutenant Treubig used the taser the second time?" In fact, when considering how to frame these questions following the jury's general verdict, defense counsel framed the proposed question to include the word "reasonable." *See* J. App'x at 127 (defense counsel proposing the question: "[D]id Lieutenant Treubig reasonably believe, even if

41

mistakenly, the plaintiff was resisting arrest when the taser was used?"). In addition, during discussions with the district court regarding the phrasing of the questions to submit to the jury, defense counsel stressed the importance of the jury being asked not only about Lt. Treubig's subjective belief, but also determining the reasonableness of that belief. *See* J. App'x at 131 (defense counsel noting: "And whether [Lt. Treubig] had a reasonable, even if mistaken, belief is a question of fact. So the jury could say you were mistaken. He is pushing himself up but you know perhaps that was some kind of active [resistance]—perhaps you could say that. . . . He could reasonably, even if mistakenly, interpret that as more resistance and so it is a fact that needs to be determined."); *see also* J. App'x at 134 (defense counsel noting, after the district court suggested it would decide the reasonableness of the mistake of fact rather than the jury, that "we do maintain that the language needs to be reasonable even if mistaken"). Nevertheless, defense counsel ultimately agreed with the district court that the word "reasonable" should be removed from the question to the jury.

Because qualified immunity is an affirmative defense, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant

42

to request that the jury be asked the pertinent question." *Zellner*, 494 F.3d at 368.

Having agreed to submit the non-pertinent question to the jury, Lt. Treubig cannot then have the district court, in addressing a Rule 50 motion, usurp the jury's role by substituting its own finding on the pertinent question. *See Outlaw*, 884 F.3d at 371 ("[T]he court accordingly made findings as to facts about which the jury was deliberately not asked. We cannot allow [the officer] now to put words in the jury's mouth."); *Zellner*, 494 F.3d at 368 ("If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding.").

In other words, in light of Jones's testimony that he offered no resistance after the first tasing because he was on the ground with his arms spread, the district court could only find that Lt. Treubig's mistaken belief regarding continued resistance was reasonable by construing the conflicting evidence in the light most favorable to Lt. Treubig rather than Jones, which the district court was not permitted to do. *See Zellner*, 494 F.3d at 371 (emphasizing that the district court is not "permitted to make findings on factual questions not submitted to the jury where those findings take the evidence in the light most favorable to the moving party, rather than the opposing party"); *Stephenson*, 332 F.3d at 78 (refusing to

43

"reweigh the evidence in [the officer's] favor" where the officer argued that the jury may have concluded that "[the plaintiff] did not objectively pose a threat of harm to [the officer] but that [the officer's] subjective belief of threatened harm was a mistake of fact that, in view of the evidence, the jury credited as reasonable"); *see also Curley*, 499 F.3d at 213 (noting that, on a Rule 50(a) motion, "any ambiguity in the interrogatories and the answers to them must, at this stage, be interpreted against [the moving party]").[11]

Accordingly, given the absence of any finding by the jury as to the reasonableness of the mistaken factual belief by Lt. Treubig regarding resistance

---

[11] We emphasize that, in connection with a summary judgment or Rule 50 motion, a district court is not required to have the jury make this reasonableness determination if no rational jury could find the officer's belief regarding the facts at issue to be unreasonable even when the evidence is construed in the light most favorable to the plaintiff, and that such facts—reasonably perceived by the defendant—establish the reasonableness of the use of force under the Fourth Amendment. *See Tracy*, 623 F.3d at 97 (concluding that the officer's use of flashlight before the arrest was reasonable as a matter of law based upon the uncontroverted facts relating to the officer's perspective, and warranted summary judgment in his favor on that particular claim); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 (10th Cir. 2008) (affirming grant of summary judgment where the undisputed facts demonstrated that, "even if [the officer's] assessment of the threat was mistaken, it was not objectively unreasonable"). Such is not the case here because, as discussed *supra*, the jury could have rationally found Lt. Treubig's belief regarding ongoing resistance to be unreasonable if, crediting Jones's version of events, it determined that Jones was face down on the ground with his arms spread out at the time of the second tasing.

by Jones after the first tasing, and given that a jury could find such a mistaken belief unreasonable when the facts are construed most favorably to Jones, any such mistake cannot be a proper basis for affording Lt. Treubig qualified immunity on the Rule 50 motion.[12]

### c. Two Taser Cycles in Rapid Succession

Lt. Treubig also contends, and the district court agreed, that the two taser cycles occurred within rapid succession of each other, and as a result, it was reasonable for Lt. Treubig to act in the heat of the moment as he did with respect to re-cycling the taser against Jones. However, we conclude that, in light of the undisputed facts in this record, the rapid succession of the two taser cycles does not change the qualified immunity analysis.

We certainly recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. As the Supreme Court has emphasized, it

---

[12] We note that the jury's separate finding in the special interrogatories that Lt. Treubig also mistakenly believed that a second taser cycle was needed to gain control of Jones's arm suffers from the same legal defect for purposes of a qualified immunity defense. That is, the lack of a finding of the reasonableness of that belief by the jury, and the evidence presented at trial on that issue, would have allowed the jury to find that subjective belief was unreasonable. Thus, that mistaken fact similarly cannot be a basis for qualified immunity here.

is extremely important to evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *see also id*. ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (quotation marks and citation omitted)). It is equally important that courts not isolate a particular act of force by an officer if it was intertwined with other acts of force in rapid succession where there was no reasonable opportunity to re-assess. However, where such an opportunity to re-assess reasonably exists, officers must consider whether additional force is necessary under the circumstances confronting the officer—a point made clear under the circumstances in *Tracy*. *See Tracy*, 623 F.3d at 97-99 (granting summary judgment on, *inter alia*, the use of force while the fugitive plaintiff was still resisting arrest, but denying summary judgment regarding the use of pepper spray because it was disputed whether the plaintiff was actively resisting arrest at that point).

This is not a case where a police officer did not have a reasonable opportunity to re-assess the circumstances before utilizing additional force. Notwithstanding the fact that Lt. Treubig's two uses of the taser occurred in rapid succession, there was clear evidence that he had enough time to re-assess the

situation between the first and second use of the taser. Specifically, Lt. Treubig testified that, after the first use of the taser for five seconds, he "[r]eassess[ed] the situation" and then re-cycled the taser. J. App'x at 84; *see also id.* ("You had to depress the trigger for five cycles and then re-assess and then press the trigger again for five seconds.").

It was clearly established at the time of the incident here that, under the Fourth Amendment, the reasonableness of the amount of force used is assessed "at the moment" the force is used. *Graham*, 490 U.S. at 396; *see also Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) ("The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."). Thus, any reasonable officer would have understood in April 2015 that, if he or she has an opportunity to re-assess a situation after firing a taser, any additional force (such as re-cycling the taser) must be justified under the Fourth Amendment based upon the totality of the circumstances that existed at the time of the re-assessment.

This fundamental Fourth Amendment rule of law was not only clear at the time of Lt. Treubig's conduct from Supreme Court cases and this Court's decisions, but also was reinforced by a compelling consensus of cases in our sister circuits,

47

including cases where courts held that additional tasing(s) in a rapidly evolving situation could violate the Fourth Amendment if the prior tasing(s) of the suspect would have been sufficient in light of the circumstances.[13] *See Meyers v. Baltimore Cty.*, 713 F.3d 723, 733 (4th Cir. 2013) ("Our conclusion that [the officer's] first three uses of the taser were objectively reasonable does not resolve our inquiry into the reasonableness of the seven additional taser shocks that he administered, because force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." (quotation marks omitted)); *Abbott*, 705 F.3d at 729, 731, 733 (holding, in a "rapidly unfolding situation," that qualified immunity did not protect an officer who squeezed the taser trigger a second time after the tased suspect, prone on the ground, did not

---

[13] Although Lt. Treubig objects to reliance on cases outside this Circuit for purposes of the qualified immunity, we have previously held that "[e]ven if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts 'clearly foreshadow a particular ruling on the issue.'" *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)); *see also Terebesi*, 764 F.3d at 231 n.12 ("Though not directly binding on this Court, the decisions of other circuits may reflect that the contours of the right in question are clearly established."). Therefore, we are permitted to consider this consensus of authority outside the Circuit although, as noted above, we conclude that the right was clearly established by Supreme Court and Second Circuit precedent independent of this consensus of other circuits.

follow an order to roll over, and emphasizing that "the fact that an initial use of force may have been justified does not mean that all subsequent uses of that force were similarly justified"); *Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) (finding that reasonable factfinder could conclude force was excessive because "[t]hree tasings in such rapid succession provided no time for [the plaintiff] to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply"); *see also Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015) ("Even if a jury were to credit the Officers' assertions that [the suspect] posed a danger to them and that he had resisted at the apartment door, the force used against him could still be found to be excessive. We have held that even previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance.").

Accordingly, because there was evidence (from Lt. Treubig himself) that he had time to re-assess whether Jones was still resisting arrest before using the taser a second time against Jones, the rapidly evolving nature of the situation as a whole does not cloak Lt. Treubig with qualified immunity for the unreasonable use of force following that re-assessment.

### d. The Need to Handcuff Jones

Lt. Treubig's argument that qualified immunity should also attach here because Jones was still uncuffed at the time of the second use of the taser is similarly flawed. In making this assertion, Lt. Treubig points to the fact that the holding in *Tracy* addressed a situation where there was evidence that the plaintiff was already handcuffed at the time the pepper spray was used. Thus, Lt. Treubig suggests that a reasonable officer would not understand from *Tracy* that the officer could violate the Fourth Amendment by re-cycling a taser into an arrestee who had been resisting and was still uncuffed. As discussed earlier, such a narrow reading of *Tracy* is simply incompatible with the language in *Tracy* which, while referencing the evidence that the plaintiff was handcuffed when pepper sprayed, made clear that it was relying on a broader Fourth Amendment principle that "a significant degree of force . . . should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Tracy*, 623 F.3d at 98. It was established long before *Tracy* that, although the fact that an individual initially resists arrest "no doubt justifies the officer's use of *some* degree of force, . . . it does not give the

officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000).

Thus, although the fact that a previously resisting arrestee had not yet been handcuffed may be an important factor in assessing the reasonableness of an officer's force, we have never held that the need to complete the arrest authorizes an additional level of force which would not be reasonably necessary to allow the officers to handcuff that arrestee safely and without further incident. *See generally Brown v. City of New York*, 798 F.3d 94, 102 (2d Cir. 2015) ("The officers could be entitled to a summary judgment only if there existed a *per se* rule that an arrestee's refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force, including taking a person to the ground and incapacitating her with pepper s[p]ray, to accomplish handcuffing. We know of no such rule.").

Here, even though Jones's hands were not yet cuffed at the time of the second tasing, there was more than sufficient evidence for a rational jury to conclude that he was no longer resisting arrest after the first tasing or posing an ongoing threat to the safety of the officers or others. Thus, any belief by Lt. Treubig that the second tasing was necessary to effectuate handcuffing Jones was

51

unreasonable. Accordingly, we conclude that, at the time of Lt. Treubig's conduct in April 2015, no reasonable officer would believe that, if an arrestee was no longer resisting and face down on the ground with his arms spread after the first tasing (as Jones testified here), the Fourth Amendment would permit an additional use of the taser simply because the arrestee still needed to be handcuffed by the surrounding officers. Therefore, construing the evidence most favorably to Jones, the fact that he was not yet handcuffed at the time of the second tasing provides no grounds for the doctrine of qualified immunity to disturb the jury's finding of excessive force relating to Lt. Treubig's conduct in this case.

This Court's analysis as it relates to the scope of *Tracy*'s holding for purposes of qualified immunity, as applied to the particular factual circumstances of this case (including the need to handcuff an arrestee who had been resisting), is completely consistent with our decision in *Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017). In *Soto*, we held that one officer, who tased a fleeing suspect, was entitled to qualified immunity as a matter of law. *Id.* at 156. On the other hand, the Court found that two different officers who tased the suspect a second time after he fell "flat on his face" were not entitled to qualified immunity as a matter of law at the summary judgment stage because of disputed issues of material fact. *Id.* at 153,

52

156, 161. With respect to the latter officers, the complaint alleged that Officer Robinson "tased Soto '[w]hen Mr. Soto, who posed no physical threat to the officers pursuing him, attempted to return to his feet.'" *Id.* at 159 (alteration in original). Although *Soto* was decided after the events in this case, the incident in *Soto* occurred in 2008, seven years before the incident here, and we held it was clearly established at that time that officers violated the Fourth Amendment when they tased a subject who was already "on the ground, completely entangled in taser wires," in close proximity to the officers, and "struggling even to get into a push-up position." *Id.* at 160. In so holding, citing *Tracy*, we emphasized that "[t]hough the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight." *Id.* at 158 (citing *Tracy*, 623 F.3d at 96-98). Therefore, in *Soto*, as is the situation here, we concluded that qualified immunity would not immunize an officer for tasing an uncuffed arrestee a second time where the arrestee was no longer resisting and was not posing a threat to the safety of officers or others.

Lt. Treubig seeks to distinguish *Soto* because, unlike the plaintiff there, "Jones suffered no injuries from the taser at all." Appellee Br. at 32. We find that

argument unpersuasive. Jones testified to temporary injury—that is, he felt numb for 30 to 40 minutes after being tased by Lt. Treubig. And, in any event, it is well established that, although the absence of significant injury is relevant to the question of excessive force, it is not dispositive under a Fourth Amendment analysis. *See Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999) ("While the main purpose of a § 1983 damages award is to compensate individuals for injuries caused by the deprivation of constitutional rights, a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury."); *Robison v. Via*, 821 F.2d 913, 923-24 (2d Cir. 1987) (concluding that excessive force claim survived summary judgment where bruising resulted from the arrest, but required no medical treatment). Thus, if the jury rationally finds that a constitutional violation occurred because the officer's significant use of force was excessive and awards nominal damages (as the jury did here), the absence of a compensable injury does not alone provide a ground for qualified immunity.

Although we hold that Lt. Treubig had fair warning of this clearly established law based upon our decision in *Tracy* years before his conduct, we again note the additional warning provided by the overwhelming persuasive

54

authority in other circuits that, prior to Lt. Treubig's conduct in April 2015, consistently reached the same conclusion with respect to the use of a taser, even where a formerly resisting suspect had not yet been handcuffed.  *See, e.g.*, *Smith v. Conway Cty.*, 759 F.3d 853, 860-61 (8th Cir. 2014) (holding that, even though the first tasing of the prisoner was justified because he had just kicked a guard, the second tasing would be unreasonable if he was no longer actively resisting, posing a security concern, or disobeying orders); *Abbott*, 705 F.3d at 732 (concluding that "it was clearly established on June 25, 2007, that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased . . . and made no movement when, after the first tasing, the officer instructed her to turn over"); *Meyers*, 713 F.3d at 735 (concluding, in a case involving ten tasing incidents against mentally ill man initially holding a baseball bat, that, although the first three tasings were reasonable because of the threat the man posed, it was clearly established in 2007 that it was excessive force to use a taser against a suspect once he was "unarmed and effectively . . . secured with several officers sitting on his back"); *Bryan*, 630 F.3d at 828, 830 (finding it unreasonable to use a taser against an uncuffed suspect who was unarmed, non-threatening, and not resisting); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) ("[T]he law was sufficiently

55

clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders . . . ."). Accordingly, existing precedent from this Court, as well as the overwhelming consensus of cases from other circuits, "placed the . . . constitutional question beyond debate," such that it was "'sufficiently clear' that every 'reasonable official would [have understood] that what he [was] doing violate[d] that right,'" *al-Kidd*, 563 U.S. at 741 (first alteration in original) (quoting *Anderson*, 483 U.S. at 640), under the factual circumstances that we must assume for purposes of the Rule 50 motion in this case.

In sum, upon a review of the relevant legal authority, we hold that it was clearly established as of April 2015 that a police officer cannot use significant force, such as a taser, against an individual who is no longer resisting or posing a threat to the officers or others. In light of the jury's findings and viewing the record on the remaining factual disputes in the light most favorable to Jones, we must assume for the qualified immunity analysis that Jones was subdued when Lt. Treubig re-cycled his taser, in that Jones was no longer resisting arrest or posing a threat to the officers or others, but rather lying face down on the ground with his

arms spread. No qualified immunity can thus exist on those facts. As a result, we reverse the district court's grant of judgment as a matter of law, and instruct that the jury verdict against Lt. Treubig should be reinstated.

## CONCLUSION

Based on the foregoing, we conclude that Lt. Treubig is not entitled to qualified immunity for the second tasing of Jones. Accordingly, the judgment of the district court is **REVERSED**, and this case is **REMANDED** for proceedings consistent with this opinion.